**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

BRANDY SNIDER,

              Plaintiff,

vs.                                  Case No. 3:04-cv-198-J-32MMH

CINGULAR WIRELESS HEALTH
AND WELFARE BENEFITS PLAN FOR
NON-BARGAINED EMPLOYEES, etc., et al.,

              Defendants.

_____

## ORDER[1]

      This case is before the Court on Plaintiff Brandy Snider's Motion for Summary Judgment (Doc. 80) and Defendants Cingular Wireless Health and Welfare Benefit Plan for Non-Bargained Employees and Metropolitan Life Insurance Company's Motion for Final Judgment Based on Review of Administrative Record (Doc. 71). Plaintiff and defendants filed memoranda in opposition to the cross motions (Docs. 83 & 84). The Court held oral argument on August 7, 2006 in conjunction with the related case, Elisa Ganceres v. Cingular Wireless Health and Welfare Benefit Plan for Non-Bargained Employees and Metropolitan Life Insurance Company, 3:04-cv-199-J-32HTS. (Doc. 87).

_____

      [1] Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

## I.    PROCEDURAL HISTORY

On March 18, 2004, plaintiff Brandy Snider ("plaintiff") filed suit under 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA") essentially seeking short term disability ("STD") and long term disability ("LTD") benefits under the Cingular Wireless Health and Welfare Benefits Plan for Non-Bargained Employees, which is administered by Metropolitan Life Insurance Company ("MetLife") (collectively "defendants"). (Doc. 1). During this case, United States Magistrate Judge Marcia Morales Howard issued two separate Reports and Recommendations. (Docs. 39 & 40). The first concerned the issue of whether the Court should consider as part of the administrative record medical records that Snider submitted to MetLife after July 15, 2003 (the date MetLife denied an appeal of its decision to deny Snider continued short term disability benefits after April 30, 2003) but before plaintiff filed suit on March 18, 2004. Snider alternatively petitioned the Court to remand this case to MetLife for a re-evaluation of her claim considering the additional medical evidence. The second issue, present in both the Snider and Ganceres cases, is whether defendants' decision finding Snider and Ganceres ineligible for long term disability benefits for failing to exhaust short term disability benefits is arbitrary and capricious.

In the first Report and Recommendation, Magistrate Judge Howard recommended denying Snider's Motion to Construe Administrative Record or for Remand and Stay (Doc. 39). The undersigned adopted that Report and

Recommendation as the opinion of the Court.  (Doc. 56).  In the second Report and Recommendation, Judge Howard found that the Administrator was not arbitrary and capricious in interpreting the Plan language to require a Plan participant to exhaust short term disability benefits before becoming eligible for consideration for long term disability benefits.  (Doc. 40).  Snider filed several objections to Magistrate Judge Howard's conclusions regarding the Plan language.  (Doc. 52).  Upon review, the undersigned determined not to act on Magistrate Judge Howard's second Report and Recommendation primarily because a decision concerning Snider's entitlement to STD benefits remained an issue in the case that had yet to be determined.  (Doc. 56). Now, this case is before the Court on cross dispositive motions and Snider's objections to the Magistrate Judge's second Report and Recommendation.

## II.    BACKGROUND

### A.    The Plan and Defendants

Cingular Wireless self-funds its Short Term Disability ("STD") benefits and insures the Long Term Disability ("LTD") benefits through MetLife.  (Doc. 72-3, Plan at p. 35 (10.1)).  The Administrator of the Plan is the Administrative Committee of Cingular Wireless ("Administrative Committee").  (Doc. 72-2, Plan at p. 22 (7.5); Doc. 72-4, Summary Plan Description ("SPD") at p. 15).  The express Plan language delegates "absolute discretion" to the Administrative Committee to administer the Plan, interpret the Plan and make benefit entitlement determinations.  (Doc. 72-2, Plan at p. 22-23 (7.7)).  The Administrative Committee, in turn, delegates this

authority to MetLife.  (Id. at p. 4 (1.27), 22 (7.5), 35 (10.1); Doc. 72-4, SPD at p. 13, 15).  Thus, MetLife administers both the STD and LTD benefits.  (Id.).

There is a two-tiered process to obtaining disability benefits under the Plan. The first is for short term disability benefits.  A disabled employee can obtain short term disability benefits for twenty-six weeks, and, depending upon the length of employment, up to 100% of their pay during this twenty-six week period.  (Doc. 72-4, SPD at p. 2).[2]  The second tier of disability benefits are LTD benefits and commence for a disabled employee when the STD are exhausted and pay fifty percent of an employee's basic rate of pay until the age of 65.  (Id. at p. 4).

To obtain STD benefits, an employee must meet the definition of "Total Disability," which is:

> Total Disability for STD benefits means that due to an illness or injury you are unable to perform your customary job or another available job assigned by your Company with the same full- or part-time classification for which you are reasonably qualified.

(Id. at p. 3).

The terms "Disability" or "Disabled" for LTD benefits mean:

> …[T]hat due to an illness or injury you are continuously unable to perform your customary job for the first (two) years of your initial date of Disability.  After (two) years, you must meet the definition of Total Disability to continue to receive Disability benefits under the Plan.

_____

[2]   The SPD sets forth the graduations concerning the duration STD benefits are payable at 100% of an employee's basic rate of pay and that which are payable at 60% of an employee's basic rate of pay.  To obtain STD benefits at 100% of the basic rate of pay, an employee must have thirteen years or more of Net Credited Service ("NCS") with Cingular Wireless.

(Id. at p. 4).

> The term "Total Disability" for LTD benefits means:

> [T]hat after (two) years from the date of your initial Disability, you are continuously prevented by your Disability from engaging in any employment for which you are qualified or may reasonably become qualified for based on education, training or experience. As long as you remain Disabled based on this definition, you may receive LTD…benefits up to the maximum of age 65.

(Id.).[3]  Further, to obtain STD and LTD benefits, a claimant must "present credible, objective medical evidence" of his or her "Disability." (Id. at p. 10, 13-14).

## B.    The Plaintiff

On December 9, 2002, Snider, a then twenty-eight year old female customer service representative for Cingular Wireless, telephoned MetLife and made a claim for STD benefits because of a bulging disc in her back. (Doc. 53, A.R. 092-096). On December 16, 2002, shortly after the initial telephone call, MetLife received an "Attending Physician Statement" from Snider's treating physician, Dr. Subaadra Sivakumaran, who noted that Snider's symptoms were "acute low back pain," and provided objective findings of "paraspinal spasm and +SLR on left side." (A.R. 006). Dr. Sivakumaran noted that his first treatment of Snider for this ailment was on June 14, 2000. (Id.). Dr. Sivakumaran denoted that Snider could return to her usual work in two weeks (December 26, 2002) and that he would need to see Snider in four

---

[3]     The original term of three years in the definitions of "Disability," "Disabled," and "Total Disability" was changed to two years in a modification after the Plan and Summary Plan Description originally issued. (Doc. 72-4, Summary or Material Modification, p. 4).

weeks.  (Id.).  Dr. Sivakumaran limited Snider from lifting over thirty pounds and denoted that there should be "no prolonged standing and sitting." (Id.).  On December 20, 2002, MetLife informed Snider that her application for STD benefits for the period December 16, 2002 through December 25, 2002 was approved.  (A.R. 014).

On December 31, 2002, MetLife received a Family Medical Leave Act ("FMLA") Health Care Provider Certification from Dr. Sivakumaran stating that Snider should be held out of work "until further notice."  (A.R. 015-017).  The form did not describe the precise reason Snider was to be held out of work, but in a telephone call that Snider placed to MetLife on December 30, 2002, Snider stated that she had not been released to work yet and that she had an appointment with neurosurgeon Dr. Antonio DiSclafani.  (A.R. 099).  Again, on January 8, 2003, Snider called and informed MetLife that she had seen Dr. DiSclafani and that he had scheduled her for surgery on January 30, 2003.  (Id.).

On January 13, 2003, Dr. DiSclafani submitted a form MetLife Supplemental Attending Physician Statement noting that Snider had undergone an MRI, she was scheduled for a microdiscectomy on January 27, 2003 and that Snider would be temporarily disabled for between six and twelve weeks thereafter.  (A.R. 022-23). MetLife referred Snider's file to a nurse for review.  (A.R. 0100).  The reviewer briefly recapitulated plaintiff's medical history and determined that the medical information supported the opinion that Snider's malady precluded her from returning to work for the six to twelve week period.  (Id.).  The reviewer further noted that MetLife should

follow up with Snider to discern her medical status approximately four weeks after surgery and obtain the medical office notes concerning Snider's post-operative period. (Id.).

On January 17, 2003, MetLife issued a letter to Snider informing her that her STD benefits had been approved through February 5, 2003 and listed the types of "specific medical information" necessary to consider a claim for continuation of benefits after February 5, 2003.  (A.R. 028).

On January 28, 2003, one day after Snider's surgery, Dr. DiSclafani submitted a Disability Claim Attending Physician Statement, in which he reiterated that Snider would be temporarily disabled for six to twelve weeks after surgery.  (A.R. 031-033). Dr. DiSclafani also provided a copy of the MRI findings from December 19, 2002, which showed a "left paracentral disc protrusion L-5 - S-1 impressing the thecal sac and extending into the left neuroforamen."  (A.R. 034).

On February 3, 2003, Dr. DiSclafani submitted another Attending Physician Supplementary Statement stating that Snider would not be able to return to work for six to twelve weeks.  (A.R. 037).  On February 5, 2003, MetLife again referred Snider's case to a nurse reviewer who opined that the submitted medical information supported a temporary disability until March 15, 2003.  (A.R. 0102).  The reviewer recommended, once again, to obtain Dr. DiSclafani's actual office notes from January 2003 through the present.  (Id.).

On February 6, 2003, MetLife again informed Snider that her STD benefits had

been extended through March 14, 2003, and that if her absence was going to extend beyond that date MetLife would require medical information in order to determine if any such extension was appropriate. (A.R. 038). This time, MetLife specifically requested the following information be provided prior to March 14, 2003 to avoid termination of benefits:

1. Copies of all office notes from Dr. DiSclafani's and test results from January 3, 2003 through Current

2. Functional abilities

3. Expected return to work date

(Id.).

On March 20, 2003, MetLife called Snider and informed her of the precise medical records that she needed to submit. (A.R. 0104). On March 24, 2003, Snider called MetLife and explained that Dr. DiSclafani informed her that she would not be able to report back to work until mid-May. (Id.). Snider also stated that Dr. DiSclafani's office had faxed "medical" (information) on March 22, 2003 and that she was "going to begin therapy next month." (Id.). MetLife informed Snider that it had not received any such documentation from Dr. DiSclafani. (Id.).

On March 24, 2003, Snider responded by submitting the MRI report and Dr. DiSclafani's Attending Physician Statement dated January 28, 2003, which had been submitted previously. (A.R. 046-048). On March 26, 2003, MetLife telephoned Snider and left her a message stating that they had "received medical and forwarded medical to RN to be reviewed." (A.R. 0104). On April 1, 2003, after again reviewing

the submitted medical information and recommending that MetLife obtain all postoperative notes, including the operative report from Dr. DiSclafani, the nurse reviewer indicated that plaintiff was temporarily disabled until April 21, 2003.  (A.R. 0105).

On April 1, 2003, MetLife issued a letter to Snider informing her that her STD benefits had been extended through April 21, 2003.  MetLife again informed Snider that she needed to submit the following to avoid termination of benefits:

1.   Copies of all office notes from Dr. DiSclafani's and test results from January 3, 2003 through April 21, 2003

2.   All Post Operative Notes (including Operative Reports)

3.   Personal Profile

4.   Attending Physician Statement

5.   All Therapy Notes

6.   Expected return to work date

(A.R. 053).  On April 16, 2003, Snider prepared the Personal Profile and denoted that she "still [had] some pain in back, [and was] only able to sit for a few hours at a time," listed that she was taking Lortab, Ibuprofen and Flexeril and stated that she intended to return to work full time once the doctor released her to do so.  (A.R. 054-059).

On April 22, 2003, MetLife received the January 27, 2003 operative report (A.R. 060-062) and the January 28, 2003 hospital discharge summary (A.R. 063).  The operative report confirmed the preoperative diagnosis of "herniated nucleus pulposus L5-S1 left," noted that "[t]he L4-L5 disk had a subcapsular disk herniation" and that

there were no complications with the surgery.  (A.R. 060-062).  The post-operative discharge summary notes that "[p]ostoperatively the patient did well."  (A.R. 063). MetLife also received another Supplemental Attending Physician Statement dated April 16, 2003 that noted plaintiff was temporarily disabled "until completion of spine strengthening."  (A.R. 068).

This information was again referred to a nurse reviewer, who reviewed the additional medical records, and opined that Snider did not have a functional impairment that precluded her from returning to work.  (A.R. 106-07).  The nurse reviewer also noted that MetLife should obtain Snider's progress notes and determine what she was doing in physical therapy.  (A.R. 0106).

On April 30, 2003, MetLife, via letter from claims administrator Jackie Reczek, terminated Snider's STD benefits.  (A.R. 072-073).  The letter stated, in pertinent part:

> Your claim is being denied because there is no objective medical evidence to support your absence from work. After reviewing the Attending Physician Statement, signed by Dr. DiSclafani on April 16, 2003, the medical provided is not supportive of significant functional impairments preventing you from being able to return to work as a Customer Service Representative.   The medical provides minimal objective findings that support functional impairments.  There also have been no physical exam findings to support continued functional impairments.  Therefore your extension of benefits on this claim has been denied.

(Id.).

On May 7, 2003, Snider submitted an appeal letter stating that while she had the surgery on January 27, 2003, she was "still in pain." (A.R. 075).  She also stated that she continued to take medication for pain and spasms and requested that "all

recommendations of [her] surgeon be taken into full consideration." (Id.).  Two days prior, on May 5, 2003, Dr. DiSclafani submitted a letter stating that Snider was "suffering from chronic back and leg pain, and [she] is not able to work at this time. ...She is soon to undergo spinal strengthening, at which time we will re-evaluate her. Until this is completed, she is not able to work." (A.R. 074).

On June 10, 2003, MetLife informed Snider that it had received her appeal letter, that her claim had been referred for an independent claim review and that it would inform Snider of the appeal decision within forty-five days.  (A.R. 076).  Then, on July 1, 2003, the appeal examiner called Snider and asked her if she intended to submit additional information or if she wanted the appeal review to begin.  (A.R. 0109).  MetLife informed Snider that the latest information it had from Dr. DiSclafani was the letter dated May 5, 2003; Snider informed MetLife that her last official visit with Dr. DiSclafani was April 15 or 16, 2003 and that they were waiting for her health insurance to approve her physical therapy so that she could see a spine specialist. (Id.).  Snider also stated that there was no additional "recent" medical information to consider.  (Id.).

On June 3, 2003, MetLife requested that an independent medical expert (neurosurgeon) review Snider's file and assess her then "current level of functionality." (A.R. 083-087).  The Network Medical Review Company retained neurosurgeon Marc Soriano to review the file and perform an assessment of Snider's physical capacities. (Id.).  Dr. Soriano is a Board Certified Neurosurgeon from the American Board of

-11-

Neurological Surgery.  (A.R. 086).

Dr. Soriano reviewed Snider's medical file, including Snider's job description (A.R. 081-082), which essentially describes a sedentary customer service position with no physical requirements.  Dr. Soriano authored a report dated July 14, 2003 that includes the following pertinent assessment and findings:

> A thorough review of submitted records has been performed.  From a neurosurgical perspective, according to the medical records, the primary diagnoses affecting Ms. Snider's ability to work are subjective complaints of back and left leg pain.

> ...From a neurological perspective, according to the medical records received, there is no impairment on the basis of any objective findings. The physical examination, history and testing do not support a complete inability to work.  No specific limitations of Ms. Snider's ability to function in her normal sedentary job as a customer service representative are supported.

> There are no specific limitations of Ms. Snider's ability to function related to any impairment since no impairment has been shown to exist.

> ...The records support that Ms. Snider has received appropriate and regular medical care.  No other treatment or medications are indicated at present.

> Ms. Snider's current level of functionality is at least light with the ability to lift/carry 20 pounds.  Her level of functioning is consistent with the demands of her sedentary job according to the Federal Dictionary of Occupational Terms.

(A.R. 086-087).  Dr. Soriano also noted that Snider has reached maximum medical improvement.  (A.R. 084).

On July 15, 2003, MetLife issued a letter to Snider informing her that her appeal was denied.  MetLife cited Dr. Soriano's report and the "lack of medical information

-12-

submitted...that would suggest [Snider was] unable to perform the customary duties of [her job] beyond April 21, 2003...." (A.R. 090).  The appeal denial letter went on to inform Snider of her rights to bring a lawsuit under ERISA.  (Id.).

Subsequent to the appeal denial, Snider repeatedly requested a second appeal.  As previously discussed, that formed the basis of a prior ruling from this Court adopting the Magistrate Judge's Report and Recommendation that the undersigned should not consider as part of the administrative record the medical records Snider submitted to MetLife after July 15, 2003.  (Docs. 39 & 56).  Thus, any letters or medical information submitted subsequent to July 15, 2003 were not considered for purposes of this opinion.

## III.    DISCUSSION

### A.    Procedural Mechanism for Review - Summary Judgment

"In an ERISA benefit denial case...in a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  Curran v. Kemper Nat. Servs., Inc., 2005 WL 894840, *7 (11th Cir. 2005) (unpublished *per curiam* opinion) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002)); accord Clark v. Hartford Life and Accident Ins. Co., 2006 WL 890660, *2 (M.D. Fla. April 6, 2006) (unpublished opinion).  "Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal

question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." Crume v. Met. Life Ins. Co., 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006) (quoting Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999)).

While MetLife posits that Rule 52, Federal Rules of Civil Procedure, addressing Findings by the Court subsequent to a bench trial, is the proper procedural mechanism to decide these ERISA cases, rather than the traditional standards associated with Rule 56, Federal Rules of Civil Procedure, this Court follows the Eleventh Circuit's discussion in the unpublished Curran[4] decision, which augments the traditional summary judgment rules as applied to review of ERISA benefit denial cases, yet still decides the case under Rule 56.  As Judge Conway so aptly discussed in Crume:

> [W]here the ultimate issue to be determined is whether there is a reasonable basis for a claims administrator's benefits decision, it is difficult to ascertain how the 'normal' summary judgment rules can sensibly apply.  After all, the pertinent question is not whether the claimant is truly disabled, but whether there is a reasonable basis in the record to support the administrator's decision on that point.  In other words, conflicting evidence on the question of disability cannot alone create an issue of fact precluding summary judgment, since an administrator's decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable.

417 F. Supp. 2d at 1273.  Thus, the proper method by which to review these ERISA

---

[4]    While it is true that the Eleventh Circuit's unpublished opinions are not binding authority and that reliance upon them alone is ordinarily disfavored, they are nevertheless persuasive.  See 11th Cir. R. 36-2 and I.O.P. 6.

benefit denial cases is as set forth in Curran and Crume, which essentially modify the traditional Rule 56 standard for ERISA disability benefits cases.

### B.    Applicable ERISA Standards

Under ERISA, the plaintiff "has the burden of showing that [s]he is entitled to the 'benefits under the terms of [the] plan.'" Stvartak v. Eastman Kodak Co., 945 F. Supp. 1532, 1536 (M.D. Fla. 1996) (quoting 29 U.S.C. § 1132(a)) aff'd, 144 F.3d 54 (11th Cir. 1998); Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998).    ERISA provides no standard for reviewing decisions of plan administrators or plan fiduciaries.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989).  After Firestone, the Eleventh Circuit adopted three separate standards for reviewing administrators' plan decisions: "(1) *de novo* where the plan does not grant the administrator discretion [i.e., the administrator does not exercise discretion in deciding claims]; (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] ... [he has] ... a conflict of interest." Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134-35 (11th Cir. 2004) (quoting HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001) (citation omitted)).

In Williams, the Eleventh Circuit recapitulated the applicable framework for analyzing "virtually all" ERISA plan benefit denials:

> 1.    Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court

disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2.     If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3.     If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4.     If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5.     If there is no conflict, then end the inquiry and affirm the decision.

6.     If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Id. at 1137-38.

Based on the "virtually all" language in Williams, it appears at first blush that the six step analysis applies in every ERISA long term disability benefits denial case. See Williams, 373 F.3d at 1137-38. The Williams court even footnoted this language and stated that "[w]e thus mean both benefits denials based on plan interpretations as well [as] on factual determinations, since many, if not most determinations will involve 'issues of both plan interpretation and fact,' ... and we will otherwise wait to be confronted by principled exception to say otherwise here." Id. at 1137, n. 6. Thus, one reading of Williams is that the Eleventh Circuit meant for the six step framework to apply to *all* ERISA cases, regardless of whether the administrator is vested with discretionary authority to determine eligibility for benefits or if there is a conflict of

-16-

interest.  An equally plausible reading, however, is that <u>Williams</u> presupposes the "heightened arbitrary and capricious" standard applies, and that the "*virtually all*" refers only to cases where the conflict of interest exists.  <u>See</u> <u>id.</u> at 1135, 1137-38; <u>see also</u> <u>Anderson v. Unum Life Ins. Co. of America</u>, 414 F. Supp. 2d 1079, 1102-03 n. 19 (M.D. Ala. Feb. 13, 2006).

Here, however, the parties agree in their respective memoranda that the Court must first determine whether MetLife's decision was "wrong" (first step of <u>Williams</u>) before it proceeds to a determination as to what other standard might apply.  (Doc. 71, p. 17-18; Doc. 80, p. 13).  Thus, before the Court undertakes the issues of whether the Plan properly grants discretionary authority to MetLife to determine entitlement to STD and LTD benefits, and whether MetLife operates under any conflict of interest in making either of these determinations, the Court will first decide under <u>Williams</u> whether MetLife's decision to terminate STD benefits as of April 30, 2003 was "wrong."

## C.    Application to STD Benefits

MetLife's decision to terminate Snider's STD benefits as of April 30, 2003 was not "wrong."  MetLife provided STD benefits to Snider from December 16, 2002 through April 30, 2003 due to a disc protrusion in her back that resulted in a microdiscectomy.  Plaintiff posits that the termination of benefits as of April 30, 2003 was wrong and unreasonable because MetLife failed to provide a sufficient discernible reason why benefits were terminated.  Defendants submit that plaintiff

failed to show any entitlement to benefits post-dating April 30, 2003 and that the objective medical evidence received as of that date was consistent with a decision to terminate benefits.

After the termination of STD benefits on April 30, 2003 and before the appeal denial on July 15, 2003, the only additional medical evidence that plaintiff submitted to MetLife was Dr. DiSclafani's May 5, 2003 letter, which essentially provided that she was suffering from chronic back and leg pain and that she was unable to work. (A.R. 074). There were no medical records or reports that accompanied the letter, and, throughout the appeal process, plaintiff submitted no additional medical records documenting her condition until after the close of her appeal on July 15, 2003.[5] Further, despite MetLife's repeated requests for additional medical records in February, March and April 2003 for all medical notes pertaining to Snider spanning that period, the only other information that Snider provided prior to MetLife's appeal decision was her January 27, 2003 operative report (A.R. 060-062), the January 28, 2003 hospital discharge summary (A.R. 063) and Dr. DiSclafani's April 16, 2003 Supplemental Attending Physician Statement (A.R. 068).

---

[5]   As set forth on pages 2 and 3 above, on September 27, 2005, this Court overruled Snider's Objections (Doc. 51) and adopted as the opinion of the Court the Magistrate Judge's Report and Recommendation (Doc. 39) recommending denial of Plaintiff's Motion to Construe Administrative Record or for Remand and Stay (Doc. 24). Essentially, the motion sought to include in the administrative record documents that Snider sent to MetLife after the July 15, 2003 appeal decision. For the reasons discussed in the Report and Recommendation, those documents were not considered in rendering this opinion. The administrative record that was considered is Doc. 53 in the docket.

While Snider focuses on that she was unrepresented during this period and confused about what she needed to do, that alone does not obviate the requirement that she meet her burden of proof to show that she is entitled to continuing STD benefits.  The Summary Plan Description is clear that STD benefits are no longer payable if the claimant has "not established [his or her] Disability based on credible objective medical evidence, as determined by the Claims Administrator," (Doc. 72-4 at p. 10), and that the claimant "[is] required periodically to provide the Claims Administrator with supplemental medical information from [his or her] physician documenting [his or her] continued Disability," (Id. at p. 13).  Other than the January post-operative documents, the April 16, 2003 Supplemental Physician Statement and Dr. Disclafani's May 5, 2003 letter, Snider provided no medical evidence that she was entitled to continuing benefits after April 30, 2003, and thus failed to carry her attendant burden under ERISA.  See Horton, 141 F.3d at 1040.  Moreover, MetLife had the independent report of Dr. Soriano (neurosurgeon) dated July 14, 2003[6] that supported a finding of no disability.  Thus, MetLife was not "wrong" to determine there were no medical findings post-dating April 21, 2003 justifying Snider's subjective

---

[6]     Even though Dr. Soriano only performed a records review of Snider, and did not treat her, it was not improper for MetLife to ascribe weight to his findings.  See Gannon v. Met. Life Ins. Co., 360 F.3d 211, 214 (1st Cir. 2004) ("physician's review of a claimant's file" is "reliable medical evidence" to support denial of benefits); Hightshue v. AIG Life Ins. Co., 135 F.3d 1144, 1148 (7th Cir. 1998) (administrator was entitled to rely on physician's review of claimant's medical file).

complaints of pain.[7]

Moreover, Snider's claim that MetLife failed to comply with 29 U.S.C. § 1133(1) because it failed to set forth specific reasons for the denial of STD benefits to Snider after April 30, 2003 is unavailing.   The April 30, 2003 denial letter specifically provides, inter alia, that:

> [a]fter reviewing the Attending Physician Statement, signed by Dr. Disclafani on April 16, 2003, the medical provided is not supportive of significant functional impairments preventing you from being able to return to work as a Customer Service Representative.  The medical provides minimal objective findings that support functional impairments. There also have been no physical exam findings to support continued functional impairments.

(A.R. 072-073).  The letter also set forth the definition of "Total Disability" under the Plan, thus informing Snider that the medical information she provided did not support a finding that her malady fell within that definition.  (Id.).  The denial letter fully explained Snider's right to appeal, informed her how to do so and explained that if her appeal was denied, she could file suit under ERISA.  (Id.).[8]  MetLife did not violate any claims procedures in the manner in which it informed Snider as to its decision, and sufficiently complied with 29 U.S.C. § 1133(1) and 29 C.F.R. § 2560.503-1(e) - (g) in terminating her STD benefits.

---

[7]   Therefore, the Court need not further address the proper standard of review under Williams.

[8]   Further, the July 15, 2003 appeal denial letter recapitulates the medical information submitted in detail and likewise articulates that there was insufficient medical evidence to support a continuing disability.  (A.R. 090).

## IV.    CONCLUSION

For the foregoing reasons, the undersigned will not disturb MetLife's decision terminating Snider's STD benefits as of April 30, 2003.  Moreover, as set forth in Magistrate Judge Howard's Report and Recommendation regarding Plaintiff's Motion to Construe Administrative Record or for Remand and Stay (Doc. 40), the determination that Snider is not entitled to STD benefits after April 30, 2003 (which is before the expiration of the initial twenty-six week period for which STD benefits are payable) obviates the need to assess Snider's entitlement to LTD benefits.  The Plan, when read in toto, is clear that a participant must obtain twenty-six weeks of STD benefits before any entitlement to LTD benefits commences.

Accordingly, it is hereby **ORDERED**:

1.    Defendants Cingular Wireless Health and Welfare Benefit Plan for Non-Bargained Employees and Metropolitan Life Insurance Company's Motion for Final Judgment Based on Review of Administrative Record (Snider Doc. 71) is **GRANTED**. Plaintiff Brandy Snider's Motion for Summary Judgment (Snider Doc. 80) is **DENIED**. Judgment shall enter in favor of the defendants and against the plaintiff.

2.    Upon an independent and de novo review of Snider's Motion to Construe Administrative Record or for Remand and Stay (Doc. 24), Snider's Objections to Magistrate Judge Marcia Morales Howard's Reports and Recommendation (Doc. 52) are **OVERRULED** and the Reports and Recommendation (Doc. 40) is **ADOPTED** as the opinion of the Court.  Thus, Snider's Motion to Construe Administrative Record

or for Remand and Stay (Doc. 24) is **DENIED**.

      3.     The Clerk is Ordered to close the file.

     **DONE AND ORDERED** at Jacksonville, Florida this <u>18th</u> day of August, 2006.


TIMOTHY J. CORRIGAN
United States District Judge


t
Copies:

Honorable Marcia Morales Howard,
United States Magistrate Judge

counsel of record